```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
L&M BUS CORP. et al.,

                              Plaintiffs,

        -against-                                                    MEMORANDUM & ORDER

                                                                     18-CV-1902 (NGG) (SMG)
BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK d/b/a NEW
YORK CITY DEPARTMENT OF EDUCATION,

                              Defendant.
-----------------------------------------------------------------X
```

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is an application for a temporary restraining order ("TRO") and preliminary injunction by Plaintiffs L&M Bus Corp.; B&F Skilled Inc.; Happy Child Transportations LLC; Happy Day Transit Inc.; Iridium Services Corp.; Penny Transportation, Inc.; Selby Transportation Corp.; Smart Pick, Inc.; GVC Ltd.; Lessel Transportation Corp.; Mar-Can Transport Co.; Phillip Bus Corp.; 21st Avenue Transportation, Co.; Y&M Transit Corp.; Van Trans LLC; Alina Services Corp.; and Montauk Student Transport LLC (collectively, "Plaintiffs" or the "Bus Companies"). (Compl. (Dkt. 1); Mem. of Law in Supp. of Mot. for TRO and Prelim. Inj. ("Mem.") (Dkt. 3).) Plaintiffs are bus companies who contract with Defendant New York City Department of Education ("Defendant" or the "DOE") for school-bus routes. (Compl. ¶ 4.)

This matter concerns the bidding process for bid number B3182, entitled "Transportation Services for Students with Disabilities and Their Non-Disabled Peers" ("B3182"). (Id. ¶ 1.) As a requirement of bidding, contractors must agree that, if they are awarded the contract, they will abide by the terms of contract Serial No. B3182 (the "Contract"). (Id. ¶ 2.) The DOE has stated that the period during which they will accept bids for B3182 (the "Bidding Process") concludes

1

on April 6, 2018. (Id. ¶ 48.) The Bus Companies seek a judgment from this court (1) declaring that the Contract violates the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq., and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., and (2) enjoining the DOE from moving forward with the Bidding Process until the alleged deformities in the Contract are fixed. (Id. ¶¶ 2-3.)

For the reasons that follow, the application for a TRO is DENIED. The court reserves judgment on the application for a preliminary injunction.

I. BACKGROUND

A. Facts

On December 29, 2017, the DOE opened the bidding process for B3182. (Compl. ¶ 40.) Through B3182, DOE is seeking 1600 vehicles to provide transportation services for students in kindergarten through twelfth grade, beginning on or about September 1, 2018, for a term of five years. (Id. ¶ 42.) Contractors seeking to bid on B3182 must, among other requirements, agree to abide by the terms of the Contract if they are successful. (Id. ¶ 40.) According to the Bus Companies, the DOE issued the Contract pursuant to its authority under state law to "approve," N.Y. Educ. Law § 2590-g(1)(g), and "[d]evelop," id. § 2590-h(36), a procurement policy for the New York City School District. (Compl. ¶ 41.) The only portion of the Contract under dispute in this matter is Section 4.5, which sets forth a number of employment requirements for winning contractors. (See id. ¶¶ 49-78; Amendment No. 2 to the Contract (Dkt. 1 at ECF p.34).)[1] The requirements in Section 4.5 fall into two categories: those arguably preempted by the NLRA; and those arguably preempted by ERISA. The court provides an overview of these provisions but

---

[1] The full text of Section 4.5 is set forth in the second amendment to the Contract, with the exception of the deletion of one paragraph as noted in the third amendment to the Contract. (See Amendment No. 2 to the Contract; Amendment No. 3 to the Contract (Dkt. 1 at ECF p.40).) Accordingly, all citations in this memorandum and order to provisions of Section 4.5 refer to the provisions of the section as contained in the second amendment.

2

does not otherwise discuss any facts that are not necessary for or relevant to this memorandum and order.

Section 4.5.1 mandates the creation of "Experienced School Bus Worker Lists" (the "ESBW Lists") from which the winning contractors and their subcontractors must fill "all positions for drivers and attendants who provide services in connection with a School Age Bus Contract awarded pursuant to" B3182 until the relevant ESBW List is exhausted. (Compl. ¶¶ 56, 60 (quoting Section 4.5.1).) The Bus Companies claim that Section 4.5.1 would require them to fire all employees who "currently work on routes that are encompassed by the B3182 RFB" and replace them with employees hired from the ESBW Lists. (Id. ¶¶ 61-62.) In addition, the Bus Companies point out that "employees, based on their position on the ESBW Lists, [would] choose their employers," and that contractors would "have no right to refuse to hire an individual as an employee once selected by an individual." (Id. ¶¶ 63-64). Section 4.5.4 states that "[n]othing herein shall be interpreted to require any contractor or subcontractor to enter into a collective bargaining agreement with any union, nor shall it prohibit any contractor or subcontractor from entering into a collective bargaining agreement with any union." (Section 4.5.4.)

Section 4.5.2 requires the contractor or subcontractor to pay employees hired from the ESBW Lists "based upon the highest wage scale pursuant to which such ESBW Hiree was paid for work performed . . . in connection with a School Age Bus Contract [or] Subcontract since June 30, 2010." (Compl. ¶ 66; Section 4.5.2.) "Contractors and subcontractors may pay a wage higher than previously paid, but not one lower than the employees' prior wages." (Compl. ¶ 66.) Section 4.5.3 additionally requires that the contractor or subcontractor "contribute at least $1,252.48/month towards health and welfare benefits on behalf of each employee who elects

family benefit coverage and $780.77/month for employees who select individual coverage." (Id. ¶ 67.) These amounts are "based on the amount that an employer must contribute for health insurance coverage under" the collective bargaining agreement of Local 1181 of the Amalgamated Transit Union. (Id. ¶ 68.) If a contractor is able to provide health benefits for less than the contractually required amount, the contractor is still required to "use the excess funds 'to provide additional or improved health/welfare benefits.'" (Id. ¶ 69 (quoting Second Amended Round 1 Questions & Answers ("Round 1 Q&As") (Dkt. 1 at ECF p.41) ¶ 115).) Section 4.5.4 requires a contractor or subcontractor to contribute to the pension fund or plan that the hiree most recently participated in unless the hiree affirmatively opts out of the prior plan. (Id. ¶ 70.) The contractor or subcontractor's contribution is calculated using "the majority of employees of equivalent seniority in the job function for which the ESBW hiree was hired . . . participating in such Prior Plan." (Id. ¶ 72 (quoting Section 4.5.4).) Section 4.5.4 also requires the contractor or subcontractor to "enter into a participation agreement" with the prior plan which "imposes no greater obligations than those imposed on a majority of the other contributing employees in such Prior Plan." (Section 4.5.4; see Compl. ¶ 73.)

Following the opening of the Bidding Process on December 29, 2017, the DOE held a pre-bid conference on January 19, 2018, at which contractors who were interested in bidding could ask questions of the DOE. (Compl. ¶ 43.) The DOE has also answered three rounds of questions submitted by the contractors, and variously amended the terms of the Contract and extended the bid submission dates. (Id. ¶¶ 45-48; see Round 1 Q&As; Amended Questions & Answers-Round 2 (Dkt. 1 at ECF p.89); Questions & Answers-Round 3 (Dkt. 1 at ECF p.104).) The final deadline for submission of bids is April 6, 2018. (Compl. ¶ 48.) The DOE intends to publicly read the submitted bids on April 9, 2018. (Id.)

4

B. **Procedural History**

The Bus Companies filed the instant action on March 29, 2018. (Compl.; Mem.) At that time, the Bus Companies noted that it was not necessary for the court to issue a ruling on the application for a TRO before April 6, 2018. (Mar. 29, 2018, Def. Letter (Dkt. 9).) The DOE submitted a response memorandum of law on April 2, 2018. (Def. Opp'n (Dkt. 12).) The court held a show-cause hearing on April 3, 2018, at which counsel for both sides appeared.

II. **LEGAL STANDARD**

A TRO "is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" Free Country Ltd v. Drennen, 235. F. Supp. 3d 559, 565 (S.D.N.Y. 2016) (Rakoff, J.) (quoting JBR, Inc. v. Keurig Green Mountain, Inc., 618 F. App'x 31, 33 (2d Cir. 2015)). "The standards for granting a temporary restraining order and preliminary injunction are the same." J.Z. v. N.Y.C. Dep't of Educ., 281 F. Supp. 3d 352, 359 (S.D.N.Y. 2017). A party seeking a TRO, like a party seeking a preliminary injunction, "must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." ACLU v. Clapper, 804 F.3d 617, 622 (2d Cir. 2015) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).

"[A] finding of irreparable harm is the most important and first element that a court must find to support issuance of a TRO—more important even than a likelihood of success on the merits." Gramercy Warehouse Funding I LLC v. Colfin JIH Funding LLC, No. 11-CV-9715 (KBF), 2012 WL 75431, at *5 (S.D.N.Y. Jan. 6, 2012); see Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir. 1999) (per curiam). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a [TRO] they will suffer an injury that is neither remote nor

speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007). The alleged injury must be "so serious that 'a monetary award cannot be adequate compensation.'" Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (quoting Citibank, N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir. 1985)).

## III. DISCUSSION

The court declines to categorically state, as the DOE would have it, that "no harm whatsoever could even possibly result from the mere receipt and opening of bids." (Def. Opp'n at 9.) Because, however, the court finds that the Bus Companies have not alleged any sufficiently irreparable immediate harms at this stage in the litigation, the court DENIES the Bus Companies' application for a TRO. The court does not reach the question of whether the Bus Companies have satisfied their burden under any of the other TRO requirements.

The Bus Companies enumerate three main irreparable harms that will supposedly befall them if the court does not enjoin the Bidding Process by April 6, 2018. First, they claim that "entering into the contract will force Plaintiffs to make monetary contributions to plans or funds that are likely unrecoverable." (Mem. at 25.) Under this argument, entering into the Contract will require the Bus Companies "to make contributions to employees' prior pension plan or fund" but that they will be "likely unable to recover any of the money that was paid into the funds" if Section 4.5 is found invalid. (Id. at 27.) While monetary damages generally cannot form the basis of irreparable harm, monetary losses that are both imminent and unrecoverable may be sufficient to make such a showing. See Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 434-35 (E.D.N.Y. 2018). Here, however, as the DOE points out, there is a statutory method pursuant to which the Bus Companies "could recover any contributions made to a pension plan if

the [c]ourt were to later invalidate the EPPs contained in a hypothetical contract." (Pl. Opp'n at 10.) The Bus Companies' claim that they "may be unable to meet" the legal standard for restitution plainly does not rise to the level necessary to show irreparable harm in the absence of injunctive relief. (See Mem. at 27 (emphasis added).)

Second, the Bus Companies state that they face irreparable harm if a TRO is not granted "because they will be exposed to legal liability." (Mem. at 25.) They conjecture that, if they are successful in bidding on the Contract, they may have to "fire their own employees," something which could expose the Bus Companies to suit for wrongful termination. (Id.) As of the issuance of this memorandum and order, the Bidding Process remains open; none of the Bus Companies have been awarded, let alone submitted a bid for, a bus contract under B3182. The Bus Companies do not allege with any specificity how future legal liability will arise—nor, at this point, could they possibly do so. The court reserves the question of whether legal liability under the Contract may be sufficiently imminent at some later point in this process, but declines to find imminent injury at the current remote juncture.

Third, the Bus Companies allege an irreparable "loss of goodwill" because, if their bids are successful, "they will be forced to fire their current employees to hire drivers from the ESBW Lists" and the Bus Companies "will lose the goodwill they have established with their employees." (Mem. at 26.) While that course of events may yet occur, this threat is "doubtful" where, as here, bidding has not yet closed and no contracts are close to being awarded. See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 38 (2d Cir. 1995). While the Second Circuit has recognized that a "speculative" loss of goodwill can sometimes constitute a sufficiently irreparable harm, that line of precedent does not apply here because the Bus Companies do not allege that, absent the EPPs, they would undoubtedly continue servicing these

7

routes for the following school year. See Reuters Ltd. v. United Press Int'l, 903 F.2d 904, 908 (2d Cir. 1990). The court also agrees with the DOE that the Bus Companies have failed to explain how any of these speculative actions would actually cause them to lose goodwill with their employees. (Def. Opp'n at 15.) For substantially the same reasons that the court does not find the possibility of legal liability to be sufficiently imminent to constitute an irreparable harm, the court also rejects the Bus Companies' claim based on the distant prospect of lost goodwill.

The Bus Companies allude to three other supposedly irreparable harms. In their memorandum, they state that they will suffer irreparable harm by being "forced to create a complex administrative scheme to implement the requirements of Sections 4.5.3 and 4.5.4, which cannot be easily unwound." (Mem. at 27.) The Bus Companies' argument on this point seems to go more to the likelihood of success regarding their ERISA preemption claim; otherwise, there is nothing to distinguish this alleged harm from the ones that the court states above are too remote. (See id. at 27-28.) Additionally, the Bus Companies aver irreparable harm on the basis that, if they succeed in their bids, they will have to enter into "illegal contracts." (Id. at 28-29.) Although this claim is similar to the earlier claim of future legal liability, it is distinct because it turns on the nature of the contract itself rather than the consequences of entering into that contract. The Bus Companies' sole citation on this point is Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367 (8th Cir. 1991). (Mem. at 29.) In that case, the Eighth Circuit entered a preliminary injunction to protect the plaintiff's "interest in participating in a legal bidding process" and to ensure "that the contract awarded will be a legal one." Glenwood Bridge, 940 F.2d at 372. There, however, the terms of the allegedly unlawful contract actually precluded the plaintiff's bid. See id. at 368. Here, while the alleged illegality

of the contract may be relevant at a future point in this litigation, there is nothing to suggest that the Contract is actively impeding the Bus Companies from submitting bids.[2]

Finally, the Bus Companies stated during the April 3, 2018, show-cause hearing that, without immediate injunctive relief, their bids will be publicly revealed on April 9, 2018, something that would put them at a competitive disadvantage if the court ultimately decides that the Contract is preempted and has to be rewritten and rebid. (See Apr. 3, 2018, Hrg. Tr. (Dkt. No. pending) 4:14-24.) Ironically, this is the Bus Companies' strongest argument for why injunctive relief is uniquely proper before the close of the Bidding Process, and the court regrets that it does not have the benefit of briefing on this issue. (Cf. id. 25:22-25 (stating that this allegation was "found nowhere in the papers").) Nevertheless, the court does not believe that this threat of harm is sufficiently serious such that injunctive relief is necessary. See Parts Distribs., LLC v. City of New York, No. 03-CV-2772 (LTS), 2003 WL 21437054, at *7 (S.D.N.Y. June 23, 2003) (stating that the plaintiff had not demonstrated irreparable harm "by reason of the terms of its bid being disclosed when all of the bids are opened and the winning (low) bidder announced"). As one court has pointed out, government actors must sometimes rebid contracts and take other corrective action after the terms of the bids have been opened. See Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 721 n.23 (2011). Furthermore, any allegation that the disclosure of this information will put the Bus Companies at a "competitive disadvantage" is not substantiated due to the fact that <u>all</u> companies who bid on the Contract will have their bids disclosed, and that there is nothing to suggest that the bids will contain trade secrets or other confidential material. The threat of disclosure of the Bus

---

[2] The DOE is also correct that the Eighth Circuit reached its conclusion without any citation to legal precedent, and that no court in the Second Circuit has ever used this case to stand for the Bus Companies' intended proposition. (Def. Opp'n at 13.)

Companies' bids, while imminent, is not the kind of irreparable harm that necessitates the "extraordinary" remedy of a TRO.

* * *

At this point, the court does not believe that the Bus Companies have alleged irreparable harm warranting injunctive relief. While the court denies the TRO, it reserves decision on the preliminary injunction. It may well be that the Bus Companies' current allegations of harm will become sufficient to sustain their action at a future point in time—be it after the bids are opened, after the contracts are awarded, after the awards have been approved by the Panel for Educational Policy, or at some other juncture. (See Hamamgian Decl. in Supp. of Def. Opp'n (Dkt. 13) ¶¶ 13-18.) It is incumbent on the Bus Companies, in their forthcoming reply brief, to define for this court what that future point is, why the harm will be irreparable absent injunctive relief, and whether the other preliminary injunction factors are also met.

## IV. CONCLUSION

For the foregoing reasons, the Bus Companies' motion for a temporary restraining order (Dkt. 1) is DENIED. The parties are reminded that the DOE's supplemental memorandum in opposition is due on April 10, 2018, and that the Bus Companies' reply memorandum, if any, is due on April 13, 2018. The court will permit the Bus Companies to submit a reply memorandum of up to fifteen pages in length, not including appendices or attachments. Cf. Indiv. R. III(C).

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
April 5, 2018

NICHOLAS G. GARAUFIS
United States District Judge