UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
L&M BUS CORP. et al.,

                Plaintiffs,

      -against-

BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK d/b/a NEW
YORK CITY DEPARTMENT OF EDUCATION,

                Defendant.
-------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**18-CV-1902 (NGG) (SMG)**

NICHOLAS G. GARAUFIS, United States District Judge.

       Plaintiffs,[1] 17 bus companies (collectively, "Plaintiffs" or the "Bus Companies"), bring this challenge to the bidding process for a contract with Defendant New York City Department of Education ("Defendant" or the "DOE") to provide school-bus transportation services for children in kindergarten through twelfth grade. Last month, this court denied Plaintiffs' application for a temporary restraining order ("TRO") but reserved judgment on the question of whether a preliminary injunction should issue. (See Apr. 5, 2018, Mem. & Order (the "M&O") (Dkt. 16) at 2.) Having considered the Plaintiffs' motion for a preliminary injunction, the court now DENIES the motion.

## I.    BACKGROUND

### A.    Facts

       The facts of this case are largely set out in the M&O and are repeated here only to the extent relevant to the instant motion.

---

[1] Plaintiffs are L&M Bus Corp.; B&F Skilled Inc.; Happy Child Transportations LLC; Happy Day Transit Inc.; Iridium Services Corp.; Penny Transportation, Inc.; Selby Transportation Corp.; Smart Pick, Inc.; GVC Ltd.; Lessel Transportation Corp.; Mar-Can Transport Co.; Phillip Bus Corp.; 21st Avenue Transportation, Co.; Y&M Transit Corp.; Van Trans LLC; Alina Services Corp.; and Montauk Student Transport LLC.

As all parties are aware, this case is about the specifications for bid number B3182

("B3182"), pursuant to which the DOE intends to award contracts for operation of approximately

20 percent of the DOE's school-bus routes for children in kindergarten through twelfth grade.[2]

(See Decl. of Lisa D'Amato ("D'Amato Decl.") (Dkt. 35) ¶ 7.) The routes funded by the DOE

provide transportation for public-school students; the routes also cover some private-school

students and the DOE additionally "reimburses transportation costs for 46 private schools that

contract with private companies to provide school transportation." (See Decl. of Alexandra

Robinson ("Robinson Decl.") (Dkt. 36) ¶¶ 4-5.) It bears noting that the DOE is the largest

school district in the country, responsible for the education of around one million school-age

students, approximately 150,000 of whom use DOE-provided buses to get to school. (See

D'Amato Decl. ¶ 14; Nat'l Ctr. for Educ. Statistics, Digest of Education Statistics: Table 215.30,

Enrollment, Poverty, and Federal Funds for the 120 Largest School Districts, by Enrollment Size

in 2014 (2016), https://nces.ed.gov/programs/digest/d16/tables/dt16_215.30.asp.)

Contractors seeking to bid in B3182 must, among other requirements, agree to abide by

the terms of contract Serial B3182 (the "Contract") if they are successful. (Compl. (Dkt. 1)

¶ 40.) According to the Bus Companies, the DOE issued the Contract pursuant to its authority

under state law to "approve," N.Y. Educ. Law § 2590-g(1)(g), and "[d]evelop," id. § 2590-h(36),

a procurement policy for the school district of the City of New York (the "City"). (Compl. ¶ 41.)

The only portion of the Contract under dispute in this matter is Section 4.5, which sets forth a

number of employment requirements for winning contractors. (See id. ¶¶ 49-78; Amendment

---

[2] For convenience, the court refers to this student population as "school-age."

No. 2 to the Contract (Dkt. 1 at ECF p.34).)[3] Collectively, the contract provisions set forth in

Section 4.5 are known as the Employment Protection Provisions (the "EPPs"). (Compl. ¶ 49.)

Several provisions of Section 4.5 are especially relevant to this case.

First, Section 4.5.1 mandates the creation of "Experienced School Bus Worker Lists" (the

"ESBW Lists") from which the winning contractors and their subcontractors must fill "all

positions for drivers and attends who provide services in connection with a School Age Bus

Contract awarded pursuant to" B3182 until the relevant ESBW List is exhausted. (Id. ¶¶ 56, 60

(quoting Section 4.5.1).) The Bus Companies claim that Section 4.5.1 would require them to fire

all employees who "currently work on routes that are encompassed by the B3182 RFB" and

replace them with employees hired from the ESBW Lists. (Id. ¶¶ 61-62.) In addition, the Bus

Companies point out that "employees, based on their position on the ESBW Lists, [would]

choose their employers," and that contractors would "have no right to refuse to hire an individual

as an employee once selected by an individual." (Id. ¶¶ 63-64). On a related note, Section 4.5.4

states that "[n]othing herein shall be interpreted to require any contractor or subcontractor to

enter into a collective bargaining agreement with any union, nor shall it prohibit any contractor

or subcontractor from entering into a collective bargaining agreement with any union." (Section

4.5.4; see Recommendation of L. Berman in Resp. to Protest ("Berman Rec.") (Dkt. 13-1) at 6.)

Second, Section 4.5.2 requires the contractor or subcontractor to pay employees hired

from the ESBW Lists "'based upon the highest wage scale pursuant to which such ESBW Hiree

was paid for work performed' in connection with a School Age Bus Contract [or] Subcontract

since June 30, 2010." (Compl. ¶ 66 (quoting Section 4.5.2).) "Contractors and subcontractors

---

[3] The full text of Section 4.5 is set forth in the second amendment to the Contract, with the exception of the deletion of one paragraph as noted in the third amendment to the Contract. (Amendment No. 3 to the Contract (Dkt. 1 at ECF p.40).) Accordingly, all citations to Section 4.5 refer to the paragraph as contained in the second amendment.

may pay a wage higher than previously paid, but not one lower than the employees' prior wages." (Id.) Section 4.5.3 additionally requires that the contractor or subcontractor "contribute at least $1,252.48/month towards health and welfare benefits on behalf of each employee who elects family benefit coverage and $780.77/month for employees who select individual coverage." (Id. ¶ 67.) These amounts are "based on the amount that an employer must contribute for health insurance coverage under" the collective bargaining agreement ("CBA") of Local 1181 of the Amalgamated Transit Union ("Local 1181"). (Id. ¶ 68.) If a contractor can provide health benefits for less than the contractually required amount, the contractor must nevertheless "use the excess funds 'to provide additional or improved health/welfare benefits.'" (Id. ¶ 69 (quoting Second Amended Round 1 Questions & Answers (Dkt. 1 at ECF p.41) ¶ 115).) Section 4.5.4 requires a contractor or subcontractor to contribute to the pension fund or plan in which the hiree most recently participated unless the hiree affirmatively opts out of the prior plan. (Id. ¶ 70.) The contractor or subcontractor's contribution is calculated using "the majority of employees of equivalent seniority in the job function for which the ESBW hiree was hired . . . participating in such Prior Plan." (Id. ¶ 72 (quoting Section 4.5.4).) Section 4.5.4 also requires the contractor or subcontractor to "enter into a participation agreement" with the prior plan which "imposes no greater obligations than those imposed on a majority of the other contributing employees in such Prior Plan." (Section 4.5.4; see Compl. ¶ 73.)

According to the Bus Companies, the EPPs were once standard in DOE bid requests, but the DOE discontinued this practice in 2012 following a ruling by the New York Court of Appeals that the DOE had not met "its burden of establishing that the [EPPs contained in old contracts (the "Old EPPs")] furthered either of the twin goals of the public bidding law: (1) getting the services at the lowest cost or (2) preventing favoritism, improvidence, fraud, or

corruption in the awarding of public contracts." (Compl. ¶ 50 (citing L&M Bus Corp. v. N.Y.C. Dep't of Educ., 950 N.E.2d 915, 920-21 (N.Y. 2011)).) The Bus Companies allege that the DOE has sought to reinsert the EPPs in its bid contracts due to lobbying by Local 1181, which the Bus Companies allege has a friendly relationship with New York City Mayor Bill de Blasio. (Id. ¶¶ 52-53.) They claim that "Local 1181's political efforts appear to have paid off because the [EPPs in new contracts (the "New EPPs")] . . . are substantially similar to the Old EPPs." (Id. ¶ 54; accord id. ¶ 65 ("The Contract also contains provisions that extend beyond what was required by the Old EPPs.").) The Bus Companies maintain that the DOE has inserted the New EPPs in order "to avoid labor strife with Local 1181" and based on the apparent belief that this will allow the Local 1181 Pension Fund (the "Local 1181 Fund") to regain its exemption from pension fund withdrawal liability. (Id. ¶¶ 74-75.)

The DOE claims that it has not "reinstated" the EPPs but instead, faced with the simultaneous expiration of contracts that alternatively do and do not contain the EPPs, is choosing to institute a uniform standard of "new" EPPs. (See Def Mem. of Law in Opp'n to Pl. Mot. ("Def. 1st Opp'n") (Dkt. 12) at 5.) The DOE states that the New EPPs are proper because they "should eliminate labor unrest[,] provide for a stable, high-quality labor force[,] . . . [and] facilitate the pursuit of a solution to pension withdrawal liability." (Mem. Regarding New EPP Provisions in Procurements of New K-12 Bus Contracts ("EPP Mem.") (Dkt. 13-2 at ECF p.2) at 3.)

Local 1181 is not the only union that represents school bus drivers and other employees. The Bus Companies state that, as of June 2017, 97 percent of school-age bus drivers were members of a union, but that "many former Local 1181 members" have joined other unions. (Compl. ¶ 27.) Ten of the Bus Companies are parties to a CBA with a union other than Local

5

1181 (id. ¶ 28); four of the Bus Companies are parties to a CBA with Local 1181 (id. ¶ 29); and three of the Bus Companies are not parties to a CBA with any union (id. ¶ 30).[4] Each of these CBAs "sets the general terms of employment through provisions that address hiring, firing, wages, and benefits." (Id. ¶ 31.) The Bus Companies claim that many of Local 1181's CBAs require contributions to the Local 1181 Fund and that the fund is "underfunded." (Compl. ¶¶ 38-39.)

### B.    Procedural History

The Bus Companies filed this action on March 29, 2018. (Compl.) The court held a show-cause hearing regarding the application for a TRO on April 3, 2018, at which counsel for both sides appeared. On April 5, 2018, this court denied the Bus Companies' request for a TRO. (M&O.) Later that day, however, Justice Eileen Rakower of the New York Supreme Court granted the Bus Companies' request for a TRO in a separate Article 78 proceeding challenging the validity of the New EPPs under state law (the "State Court Action"). (Order, L&M Bus Co. v. Bd. of Educ., No. 152673/2018 (N.Y. Sup. Ct. Apr. 5, 2018) (the "State Court Order") (Dkt. 17-1).) The DOE appealed from Justice Rakower's decision to the New York Supreme Court, Appellate Division, which has not yet issued a decision. As of yet, the TRO issued in the State Court Action remains in place.

At the April 3, 2018, hearing, the court granted the DOE leave to file a supplement to its memorandum in opposition to the Bus Companies' motion and granted the Bus Companies leave to file a reply. (Apr. 3, 2018, Min. Entry.) Subsequently, the court granted non-parties Reliant Transportation, Inc. ("Reliant"); Local 1181; and International Brotherhood of Teamsters, Local

---

[4] Plaintiffs Happy Day Transit, Inc., Iridium Services Corp., and Alina Services Corp. are currently not parties to a CBA with any union and accordingly only assert claims under the Employee Retirement Income Security Act ("ERISA"). (Compl. ¶ 30.)

553 ("Local 553") leave to participate in the case as amici. (Apr. 12, 2018, M&O (Dkt. 28);

Apr. 16, 2018, Order.) The court also granted the DOE leave to respond to Local 553's amicus

brief. (Apr. 16, 2018, Order.) The court therefore has the following papers before it: The Bus

Companies' initial memorandum of law in support of their motion (Mem. of Law in Supp. of

Mot. for TRO and Prelim. Inj. ("Mem.") (Dkt. 3)) and reply brief (Reply in Supp. of Mot. for

Prelim. Inj. ("Reply") (Dkt. 53)); the DOE's initial brief in opposition (Def. 1st Opp'n),

supplemental brief in opposition (Def. Suppl. Opp'n (Dkt. 33)), and response to Local 553's

amicus brief (Mem. in Opp'n to Local 553 Amicus Br. ("Resp. to Local 553 Br.") (Dkt. 50)); an

amicus briefs in support of the Bus Companies by Local 553 (Mem. of Law of Local 553 as

Amicus Curiae ("Local 553 Br.") (Dkt. 43)); and amicus briefs in support of the DOE by Reliant

(Mem. of Law of Reliant as Amicus Curiae ("Reliant Br.") (Dkt. 38)) and Local 1181 (Mem. of

Law of Local 1181 as Amicus Curiae ("Local 1181 Br.") (Dkt. 40)).

## II.    LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be

granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v.

Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted) (quoting 11A Charles A.

Wright et al., Federal Practice and Procedure § 2948, at 130 (2d ed. 1995)). A party seeking a

preliminary injunction "must generally show a likelihood of success on the merits, a likelihood

of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the

party's favor, and that an injunction is in the public interest." ACLU v. Clapper, 804 F.3d 617,

622 (2d Cir. 2015) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).[5]

---

[5] The Second Circuit has, at times, formulated this standard differently. For example, a party seeking a preliminary injunction may demonstrate the existence of "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in [its] favor," rather than a likelihood of success on the merits. Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010); see

## III.  DISCUSSION

After applying all four preliminary injunction factors, the court denies the Bus Companies' motion for a preliminary injunction.  First, the Bus Companies are still unable to meet the irreparable-harm requirement.  Second, even if they could meet that requirement, the court is not convinced that they have shown a likelihood of success on the merits at trial.  Finally, the balance of equities and the public interest at stake also resolve themselves in the DOE's favor.

### A.  Irreparable Harm

As with a TRO, "'[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'"  Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (quoting Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 233 (2d Cir. 1999)). (See M&O at 5.)  "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a [TRO] they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007).  The alleged injury must be "so serious that 'a monetary award cannot be adequate compensation.'"  Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (quoting Citibank, N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir. 1985)).

This court previously denied the Bus Companies' application for a TRO because they had "not alleged any sufficiently irreparable immediate harms at [that] stage of the litigation."

<hr>

also id. at 35-38 (holding that this "serious questions" standard survives Winter and other Supreme Court cases applying a "likelihood of success on the merits" standard).  The Second Circuit's "serious questions" standard does not apply, however, "[w]hen . . . a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme," Friends of the East Hampton Airport, Inc. v. Town of East Hampton, 841 F.3d 133, 143 (2d Cir. 2016) (internal quotation marks and citation omitted), as is the case here.  In addition, all parties agree that the "likelihood of success on the merits" standard applies here.  (See Mem. at 11; 2d Opp'n at 7.)

(M&O at 6.)[6] Because the Bidding Process remains enjoined and the bids for B3182 have not yet been made available to the public, the court reincorporates its previous findings as to the likelihood that the Bus Companies would suffer irreparable harm absent an injunction. In order for the Bus Companies to obtain a preliminary injunction, they continue to bear the burden of convincing the court that irreparable harm will come about merely from the conclusion of the bidding process.[7]

In their reply brief, the Bus Companies put forth three arguments in support of their claim of irreparable harm. First, they argue that they are being forced into a "Hobson's choice" regarding "whether to submit a bid at all," and that the risk of harm from either choice is "irreparable harm that can only be prevented through a preliminary injunction." (Reply at 3-5.) Second, they argue that they will be irreparably harmed by the public disclosure of bids. (Id. at 5-6.) This second argument was raised at oral argument on the TRO request, but the court had not had the benefit of written briefing until now. Third, the Bus Companies argue that the forthcoming issuance of "letters of intent to the lowest responsible bidders who are likely to be awarded routes" constitutes irreparable harm because winning and losing bidders might rely on the letters, which could end up backfiring "if Section 4.5 is found impermissible and the routes are rebid." (Id. at 6-7.) Although only the second argument was raised before the Bus

---

[6] Meanwhile, the New York Supreme Court granted the Bus Companies' application for a TRO in the State Action, in part because of "the Honorable Carol Edmead's finding of irreparable harm in her September 5, 2008[,] decision in L&M." (Apr. 5, 2018, State Court Decision & Order (Dkt. 17-1) at 2.) As best as this court can tell, however, that September 5, 2008, decision stated that the challengers in that decision—who sought to invalidate the Old EPPs— failed to demonstrate that they would be irreparably harmed without temporary relief, while finding that it was "the students, their parents, and the DOE" who would be irreparably harmed by issuance of a TRO. L & M Bus Corp. v. N.Y.C. Dep't of Educ., No. 104001, 2008 WL 4559881, at *5 (N.Y. Sup. Ct. Sept. 5, 2008).

[7] While the bidding process for B3182 remains enjoined pursuant to the State Court Order, and thus there is no irreparable harm at this time, the court recognizes that the TRO issued by Justice Rakower could be dissolved at any moment. (See Reply at 3 n.2.) The court's consideration of irreparable harm thus really turns on the question of whether irreparable harm would befall the Bus Companies if the TRO in the State Court Action were lifted. Cf. Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 435 (E.D.N.Y. 2018).

Companies submitted their reply brief, the court will deal with all three arguments for the reasons that follow. Cf., e.g., Emigra Grp. v. Fragomen, Del Rey, Bernsen & Loewy, LLP, 612 F. Supp. 2d 330, 349 (S.D.N.Y. 2009) ("[A] moving party will not be heard to advance a new argument for the first time in its reply brief . . . .").

### 1. "Hobson's Choice"

The Bus Companies first argue that they are being forced into an untenable "Hobson's choice": bid, and risk exposure to multiple sources of liability; or refuse to bid, and risk being forced to go out of business. (Reply at 3-4.) This argument necessarily incorporates their original claims—rejected by this court in the M&O—that bidding on the contract might expose the Bus Companies to "legal liability" and "loss of goodwill." (Mem. at 25-26; see M&O at 7-8.) Thus, the court will consider the Bus Companies' arguments, even without a formal response by the DOE.

As the court has already stated, the risk of harm from legal liability is too speculative when "the Bidding Process remains open [and] none of the Bus Companies have been awarded, let alone submitted a bid for, a bus contract under B3182." (M&O at 7.) In their reply brief, the Bus Companies attempt to present evidence that winning bidders face sufficiently imminent legal liability. The Bus Companies claim that winning bidders "risk entering into a contract that exposes them to withdrawal liability when the contract is ultimately rebid because Section 4.5 is ruled invalid through this litigation" (Reply at 4), but the court rejects this argument because Section 4.5 is unlikely to be invalidated in this litigation. (See infra Section III(B).) The Bus Companies also claim that they risk "liability from their unions due to breaches of CBAs that have conflicting terms with Section 4.5" and "litigation from the union to which [a unionized Bus Company] is party to a CBA if its reconstituted Section 4.5 workforce moves to decertify

that union." (Reply at 4 & n.3.) The court cannot find irreparable harm based on vague

assertions that "Section 4.5 . . . would . . . require [a Bus Company] to breach its CBA now in

effect" (see Decl. of David Franco (Dkt. 53-2) ¶ 10) or that "[a Bus Company's] new employees

may . . . move to decertify [their union]" (id. ¶ 9). Like with the Bus Companies' assertions of

future legal liability, the court cannot enjoin a contract based on speculations of future conflict

without any concrete basis for the harms' supposed imminence.

2.    Public Disclosure of Bids

In the M&O, the court stated that the Bus Companies' allegation of competitive

disadvantage from the public revelation of bids was their "strongest argument for why injunctive

relief is uniquely proper before the close of the Bidding Process," and noted the irony that this

argument had not been made in the Bus Companies' moving papers. (M&O at 9-10.) While the

court rejected that allegation of harm at the TRO stage, it remained open to persuasion regarding

the irreparability of this harm. The Bus Companies have now fleshed out this line of argument in

their briefing, claiming that, "[i]n the event of a rebid with Section 4.5 removed," bus operators

that bid on B3182 would be at a "significant" disadvantage relative to new bidders because

> a company that did not previously bid will be able to determine the
> price it needs to submit to be competitive and which routes may be
> easier to win by looking at who and how many companies bid on
> certain routes against whom it will likely be bidding, and the
> capacity and overhead costs of its competitors.

(Reply at 5.) Additionally, the Bus Companies claim that new bidders would "have the element

of surprise on their side" because "rebidders [would] not know which new companies are

planning to submit bids or their bidding strategy." (Id. at 5-6.) These possibilities, the Bus

Companies posit, would amount to an uneven "playing field if the contract is rebid." (Id. at 6.)

The only case the Bus Companies point to in support of their claim is RhinoCorps Ltd. v.

United States, 87 Fed. Cl. 673 (2009), in which the Court of Federal Claims found irreparable

harm based on the fact that the federal government, in deciding not to renew a contract with the plaintiff, had seemingly "pre-judged" the plaintiff to be "incapable of satisfying its requirements" under the bid solicitation. See id. at 678-79. The plaintiff's lost "opportunity to compete for a contract on a level playing field" did not come from the disclosure of the plaintiff's bidding terms, but rather from the fact that the government had allegedly determined, prior to the bidding, that the plaintiff would not be able to meet the requirements. See id. at 679. That case is thus nothing like this one.

While the Bus Companies quibble with the DOE's—and the court's—use of Parts Distributors, LLC v. City of New York, No. 03-CV-2772 (LTS), 2003 WL 21437054 (S.D.N.Y. June 23, 2003), "to establish that the public disclosure of bids cannot amount to irreparable harm," that case is more similar to the situation before the court. (See Reply at 6; cf. M&O at 9; Def. Suppl. Opp'n at 9.) In that case, much like the current one, the risk of harm stemmed from the disclosure of bidding terms and how the public nature of that information might harm the plaintiff. Parts Distributors, 2003 WL 21437054, at *7. As discussed in the M&O, the court is concerned that finding irreparable harm from the disclosure of bidding terms based only the remote possibility of an eventual rebid could hamstring government bodies and other actors who need flexibility in their ability to put contracts out to bid. (See M&O at 9 (citing Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 721 n.23 (2011)).) Cf. M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1303 (D.C. Cir. 1971) ("It would be intolerable for any frustrated bidder 'to render uncertain for a prolonged period of time government contracts which are vital to the functions performed by the sovereign.'" (quoting Blackhawk Heating & Plumbing Co. v. Driver, 433 F.2d 1137, 1141 (D.C. Cir. 1970))). Courts should deny the government such flexibility only where a rebid puts previous bidders at an obviously

unnecessary disadvantage, see Sheridan Corp. v. United States, 95 Fed. Cl. 141, 155 (2010) (enjoining rebid found to be arbitrary and capricious), something that is not the case here. The court sees no reason to upset its previous finding that the Bus Companies can establish no irreparable harm from the mere disclosure of bidding terms at this stage.

3.     Letters of Intent

Finally, the Bus Companies state that both winning and losing bidders will be harmed by acting in reliance on whether or not they receive "letters of intent [issued] to the lowest responsible bidders who are likely to be awarded routes" even though their actions would be for naught "if Section 4.5 is found impermissible and the routes are rebid." (Reply at 6-7.) As with the Bus Companies' first argument, the court rejects this claim of irreparable harm because the court does not believe it is likely that Section 4.5 will, through the course of litigation, be found impermissible, necessitating rebidding of the routes.

*     *     *

By a rough count, the court has now denied the Bus Companies' allegations of irreparable harm on nine different grounds. (See M&O at 6-10; supra Section III(A).) In the M&O, the court allowed that the Bus Companies' "[then-]current allegations of harm [could] become sufficient to sustain their action at a future point in time." (M&O at 10.) Without movement in the bidding process, that future point in time has still not come. Because the Bus Companies have still not alleged imminently irreparable harm that will come about as a result of the continuation of the bidding process for B3182, the court cannot grant the Bus Companies' motion for a preliminary injunction. Although a failure to establish irreparable harm usually renders consideration of the other preliminary-injunction factors unnecessary, cf., e.g., T-Mobile Ne. LLC v. Riverhead Water Dist., No. 15-CV-6310 (SJF), 2016 WL 373968, at *3 (E.D.N.Y.

Jan. 29, 2016), the court will address the other three factors, in part because a portion of the above analysis turns on the Bus Companies' inability to establish a likelihood of success on the merits.

**B.    Likelihood of Success**

In order to establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty [but rather] need only make a showing that the probability of his prevailing is better than fifty percent." Eng v. Smith, 849 F.2d 80, 82 (2d Cir. 1988). "Where a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits on one of the claims." Eve of Milady v. Impression Bridal, Inc., 957 F. Supp. 484, 487 (S.D.N.Y. 1997).

The Bus Companies argue that Section 4.5 is preempted by both the NLRA and the Employee Retirement Income Security Act ("ERISA"). The DOE disagrees with the Bus Companies' claims of preemption, and additionally argues that the preemption question is beside the point because the DOE promulgated B3182 in its capacity as a participant in the market for bus-contracting services. The court concludes that the bidding process here is not preempted by the NLRA or ERISA because of the market-participant exception, and thus that the Bus Companies have not established a likelihood of success on the merits.

1.    NLRA Preemption

    *a.    Legal Overview*

        i.    Preemption Doctrine

The Supremacy Clause of the United States Constitution "'secures federal rights by according them priority whenever they come in conflict with state law.'" Rondout Elec., Inc. v. N.Y. State Dep't of Labor, 335 F.3d 162, 166 (2d Cir. 2003) (alteration adopted) (quoting

Golden State Transit Corp. v. City of Los Angeles (Golden State II), 493 U.S. 103, 107 (1989)).

Thus, while "[t]he NLRA does not contain an express preemption provision," courts have

identified "implicit limits [that Congress has placed] on the permissible scope of state regulation

touching upon labor-management relations." Concerned Home Care Providers, Inc. v. Cuomo,

783 F.3d 77, 84 (2d Cir. 2015) (quotation marks omitted).

One form of implied preemption under the NLRA, known as Garmon preemption, forbids

"state regulation that either prohibits conduct subject to the regulatory jurisdiction of the NLRB

under section 8 of the NLRA or facilitates conduct prohibited by section 7 of the NLRA."

Rondout, 335 F.3d at 167 n.1 (citing San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236,

244-47 (1959)). Garmon preemption "is intended to preclude state interference with the National

Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of

regulation' established by the NLRA." Golden State Transit Corp. v. City of Los Angeles

(Golden State I), 475 U.S. 608, 613 (1986) (quoting Wis. Dep't of Indus. v. Gould, Inc., 475

U.S. 282, 289 (1986)). The other form of NLRA preemption, known as Machinists preemption,

"forbids states and localities from intruding upon 'the [labor-management] bargaining process.'"

Concerned Home Care Providers, 783 F.3d at 84 (alteration in original) (quoting Lodge 76, Int'l

Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm'n

(Machinists), 427 U.S. 132, 149 (1976)). Under Machinists, the states must leave "aspects of the

bargaining process" that are not covered by Sections 7 and 8 of the NLRA—that is, everything

other than "the right to organize and engage in other forms of protected concerted action, and

identify forms of unfair labor practices"—"'to be controlled by the free play of economic

forces.'" Id. (quoting Machinists, 427 U.S. at 140).

ii.    The Market-Participant Exception

"A major limitation on the labor law preemption doctrines is the principle that state conduct will not be preempted if the state's actions are proprietary, rather than regulatory." Healthcare Ass'n of N.Y. State v. Pataki, 471 F.3d 87, 107 (2d Cir. 2006) (citing Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors (Boston Harbor), 507 U.S. 218, 226-30 (1993)). This exception to NLRA preemption is known as the "market-participant exception," and permits a state to act in "'pursu[it of] its purely proprietary interests, and where analogous private conduct would be permitted.'" Id. (quoting Boston Harbor, 507 U.S. at 231-22). Where the state is acting as a market participant, its actions "are not regulation and so are not normally subject to preemption analysis at all." Bldg. Indus. Elec. Contractors Ass'n v. City of New York (BIECA), 678 F.3d 184, 188 (2d Cir. 2012).

In determining whether challenged government action falls within the market-participant exception, that courts must answer two questions:

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances?  Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

Healthcare Ass'n, 47 F.3d at 109 (quoting Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686, 693 (5th Cir. 1999)). These questions "seek to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out." Cardinal Towing, 180 F.3d at 693.

"[W]hen a court assesses whether a governmental policy has a regulatory purpose, it looks primarily to the objective purpose clear on the face of the enactment, not to allegations

16

about individual officials' motivations in adopting the policy." BIECA, 678 F.3d at 191. Thus, "where a permissible purpose is apparent," the court may not "search for an impermissible motive" "because federal preemption doctrine evaluates what legislation does, not why legislators voted for it or what political coalition led to its enactment." Id. (alteration adopted) (quotation marks omitted). Additionally, consideration of whether the challenged action has a "narrow scope" essentially boils down to whether it "governs the parties' behavior on the specific project or projects in the contract rather than on unrelated matters to which the state might not even be a party." Id. at 189 n.2. The Second Circuit has rejected attempts to reformulate this inquiry into one centered on the net effect of the challenged action, clarifying that "'narrow' refers to the range and type of covered conduct, not to the number of covered projects." Id. As with the question of objective purpose, the inquiry into the action's "scope" is intended to discern whether the government body acted with "regulatory rather than proprietary intent." Id.

> b.    *Application*

The Bus Companies contend that the New EPPs are preempted by the NLRA because "Section 4.5 causes Plaintiffs to breach collectively bargained[-]for rights and existing CBAs, which constitute unfair labor practices under the NLRA." (Mem. at 12.) They state that the DOE cannot claim protection as a market participant because "Section 4.5 . . . includes terms that no reasonable private contractor would ever consider" and because "the DOE has made it clear that it intends to apply Section 4.5 to every school busing contract in the future." (Reply at 10-11.) In response, the DOE maintains that it is acting "in the role of a purchaser of school bus transportation services," rather than as a regulator. (Def. Suppl. Opp'n at 14.) The court agrees

that the DOE is acting as a market participant, and so its actions in soliciting bids under B3182 are not subject to a preemption challenge under the NLRA.

### i. Objective Purpose

The court begins its analysis of the market-participant exception by examining the objective purpose of Section 4.5. It is clear on the face of Section 4.5 that the DOE had a neutral, non-regulatory purpose for inserting the New EPPs. Section 4.5 does not mention Local 1181 or any other union. (See generally Section 4.5.) If there is any text in Section 4.5 itself that evinces a particular purpose, it is to be found in the title, which communicates an intent by the DOE to "protect[]" "employee[s]." (See id.) Even if the "face of the enactment" includes the various documents published by the DOE throughout the bidding process, nothing in those documents contradicts the DOE's claim that it included the New EPPs to "facilitate labor peace, minimize the threat of withdrawal liability assessments that might deter prospective bidders, and attract and preserve a qualified and stable workforce." (See Def. Suppl. Opp'n at 14.) These stated concerns are not post hoc rationales invented for litigation, but have been clear on the face of the record since the beginning of the Bidding Process. (See EPP Mem. at 14 (listing the benefits of bidding out contracts with New EPPs); see also Berman Rec. at 6 (discussing various justifications for the EPPs).) The court finds that all three of these concerns are valid interests for the DOE to hold as a market participant.

Even looking beyond the face of Section 4.5, the court still concludes that the DOE's behavior in inserting the New EPPs reflects its "interest in the efficient procurement of goods and services, as measured by comparison to typical private market behavior." See Johnson v. Rancho Santiago Cmty. College Dist., 623 F.3d 1011, 1024 (9th Cir. 2010). Plainly put, the DOE has a procurement-related need to contract with private bus operators for the provision of

citywide school-bus operations. In the course of securing these contracts, the DOE has chosen to institute certain terms that it believes will result in better contractual outcomes. The Bus Companies do not argue that the DOE does not have a legitimate procurement-related need to contract for these routes, but rather argue that the DOE's reasons for instituting the EPPs are pretext for its desired <u>regulation</u> of the busing industry.

The Bus Companies enumerate a litany of complaints reflecting their belief that "the DOE does not credibly connect its action with its goals." (Reply at 9; <u>see</u> Mem. at 13-17.) First, regarding the DOE's claim of labor peace, the Bus Companies opine that "while Section 4.5 may placate Local 1181, the DOE fails to address the fact that Section 4.5 may cause a strike from one of the many other unions in the industry." (Reply at 9.) The Bus Companies misconstrue what the DOE has said. While the EPP Memorandum—a 2017 document in which Erin Lester, Special Assistant to Deputy Chancellor Elizabeth A. Rose, recommended that the DOE include the New EPPs in new solicitations for school bus contracts—lists a number of Local 1181-led strikes as evidence of the history of labor strife in the school bus industry, it does not say that Section 4.5 is intended only to placate Local 1181. (<u>See</u> EPP Mem. at 4-7.) If the Bus Companies are correct that Local 1181 used to represent around 80 percent of "School Age bus drivers and attendants who drove New York City routes" but its representational share has precipitously declined over the past two decades (Mem. at 5), it stands to reason that (1) this is perhaps why many of the past strikes only involved Local 1181, and (2) the DOE's concerns about future strikes are even less tied to Local 1181 than they would have been in the past. While a government body cannot immunize every action with a claim of "labor peace," such a rationale plainly holds up in the instant context. <u>See Airline Serv. Providers Ass'n v. L.A. World</u>

Airports, 873 F.3d 1074, 1080 (9th Cir. 2017) (approving of labor peace as a proprietary goal), petition for cert. filed, No. 17-1183 (U.S. Feb. 23, 2018).

Second, the Bus Companies strenuously object to the DOE's asserted desire to "minimize the threat of withdrawal liability assessments that might deter prospective bidders," claiming that Section 4.5 "does just the opposite by requiring employers to contribute to pension funds that they otherwise have no involvement with, nor are required to contribute to pursuant to a CBA." (Reply at 9.) As with labor peace, this concern is one that the DOE supports with a reasonable, stated rationale. (See EPP Mem. at 15; see also id. at 10-11 (discussing the history of pension withdrawal liability issues); Mem. Regarding Withdrawal Liability Demands from Local 1181 Pension Fund and Related Litigation (Dkt. 13-2 at ECF p.20).) The Bus Companies fault the DOE for not providing "assurances that the [Pension Benefit Guaranty Corporation ("PBGC")] is willing to reinstate the exemption for the Local 1181 Fund or provide a similar exemption to other pension funds" (Reply at 9), but the DOE (a city agency) cannot be expected to speak on behalf of the PBGC (a federal agency). Additionally, the DOE claims that "Local 1181 provides no indication in its amicus submission that it is even interested in restoring the exemption" (id.), but Local 1181 did say in its amicus brief that inclusion of the EPPs "makes it likely that the withdrawal liability exemption will be restored, thus alleviating prospective bidders' concerns" (Local 1181 Br. at 12). In the end, while the Bus Companies' arguments regarding the uncertain nature of future immunity from withdrawal liability are well taken, the court cannot say that the DOE has not made a credible claim that it is promulgating the EPPs to alleviate pension withdrawal liability and to make bidding more attractive to prospective contractors. Finally, the Bus Companies claim that the DOE has "no basis [for its belief] that Section 4.5 will actually bring new drivers to the industry." (Reply at 9.) The Bus Companies conjecture that prospective

drivers will be dissuaded from becoming school-bus drivers lest they be stuck with "the last pick of their employer until they amass enough years of experience to choose the employer they want," but provide no evidentiary support for this assertion. (Id.) Rather, if the Bus Companies are correct that the EPPs will raise the floor for wages and benefits (see id. at 4 n.5), it seems just as likely that the EPPs will attract new drivers. (See EPP Mem. at 15-16.)

More broadly, the Bus Companies argue that the DOE's behavior is insufficiently similar to that of "private parties in similar circumstances." (See Mem. at 17.) Because the above-discussed terms, in the opinion of the Bus Companies, "are clearly not market terms and are atypical of agreements among private parties," the DOE must therefore be "acting as a regulator rather than a market participant with respect to the provisions of Section 4.5." (Id. at 17-18.) Reliant challenges this premise, claiming, contra its fellow bus operators, that "the hiring, wage and benefit components of the EPPs are common features of project labor agreements." (Reliant Br. at 2.) In support of its contention that the EPPs are intended to "ensure the uninterrupted provision of quality bus services," Reliant points to a "series of debilitating and costly events" that resulted from the removal of the Old EPPs in 2012, "including a five-week strike by [Local 1181], lawsuits and significant withdrawal liability exposure to the City and bus vendors." (Id. at 13-14.) Thus, "any private party would" impose contractual terms necessary "to avoid consequences as disruptive and costly as those." (Id. at 14.) While the Bus Companies' reply brief responds to various of Reliant's defenses regarding Machinists preemption (see Reply at 12-13), it does not effectively respond to Reliant's argument that the EPPs are within the range of "typical behavior of private parties in similar circumstances," Healthcare Ass'n, 47 F.3d at 109. The court agrees with Reliant that the New EPPs reflect typical market behavior by the DOE, even if the Bus Companies would prefer different contractual terms.

At the end of the day, the Bus Companies' reason for bringing this lawsuit seems clear: their belief that "Section 4.5 is merely a thinly veiled attempt to support [Local 1181]." (Reply at 2.) But even if "political favoritism" was a "motivating factor" in the DOE's decision-making process, that alone cannot transform the Contract into a preemptible "regulation[]." See BIECA, 678 F.3d at 192. This argument is doomed by the lack of record evidence proving that the DOE's stated rationale for incorporating the New EPPs into the Contract is pretext.

### ii. Narrowness of Scope

Challengers to a government action may also defeat the government's claim of market participation by pointing to the action's insufficiently "narrow" "scope." See BIECA, 678 F.3d at 189 ("[A] state law or contract with profound effects outside the state's market interest in the transaction [may] be preempted."). The Bus Companies are unable to satisfy this prong.

B3182 is a solicitation for bids on a five-year contract concerning the provision of school-bus transportation for "children with disabilities and others in [k]indergarten through [g]rade 12." (D'Amato Decl. ¶ 5.) The DOE attests that the number of routes included in the expiring contracts constitute approximately 20 percent of all of the routes currently operating under DOE contracts for school-age children. (Id. ¶ 7.) An additional 18 percent of routes are operated under contracts set to expire June 30, 2019, and the remaining 62 percent of routes are operated under contracts expiring June 30, 2018, but that the DOE intends to extend for an additional term. (Id. ¶¶ 8-9.) These numbers do not include contracts for the transportation of "younger children," which are "entirely separate" from the contracts at issue in this case. (See id. ¶ 13.) These numbers also do not include routes located outside of New York City.

The Bus Companies point to the scope of Section 4.5—and the resulting, supposedly "broad impact" it will have—as evidence of DOE's participation in the marketplace for bus

services as a regulator, not proprietor. (See Reply at 11.) They contrast this case with Boston Harbor, claiming that the market-participant exception applied there because "'the challenged action . . . was specifically tailored to one particular job, the Boston Harbor cleanup project,'" while "the DOE has made clear that it intends to apply Section 4.5 to every school busing contract in the future." (Id. (quoting Boston Harbor, 507 U.S. at 232).) But the Bus Companies' misunderstand what it means for a contract to have a "narrow" scope. It does not mean that the contract must only relate to one discrete project. If that were the case, no government body could ever procure services for use on a variety of separate but related projects, as is the case with bus routes.

The operative question, as made clear by the Second Circuit in BIECA, is whether the contract "governs the parties' behavior on the specific project or projects in the contract rather than on unrelated matters to which the state might not even be a party." 679 F.3d at 189 n.2 (emphasis added). In order to answer this question, a comparison with Cardinal Towing is instructive. See BIECA, 679 F.3d at 189 n.2 (citing with approval Cardinal Towing's reasons for "finding a regulation narrow in scope"). That case concerned the system used by the City of Bedford, Texas, for calling tow trucks to deal with abandoned or disabled vehicles on public streets—what the court will refer to as "non-consensual City police tows." Cardinal Towing, 180 F.3d at 688. Bedford had previously used a rotation system whereby the non-consensual City police tows would be carried out by one of a number of local towing companies based on a rotation system. Id. at 688-89. "For a number of reasons," Bedford later passed a law setting forth a bidding process, along with specified bidding criteria, to select a single company to handle all of Bedford's non-consensual City police tows. Id. at 689. In finding that this ordinance had a sufficiently narrow scope, the Fifth Circuit focused on a number of factors.

First, the court pointed to the fact that the ordinance did not affect all tows (private tows and situations in which the vehicle owner was available to request a towing company were unaffected), but only one type of tow. Id. at 694. Second, the court found that the bid specifications set forth in the ordinance "looked only to the bidder's dealings with the City." Id. Finally, the court focused on the fact that the specifications only applied to "a single contract for police tows," not "all City contracts going forward." Id. These factors led the court to conclude that the action had a limited scope that "decisively foreclose[d] an inference that the City sought to change the tow truck industry as a whole, let alone influence society at large." Id.

Applying these considerations to Section 4.5 and B3182 makes it clear that the DOE has promulgated the Contract in its proprietary capacity. Much like the towing ordinance, B3182 covers school-aged bus routes; it does not cover bus routes for pre-kindergarten students, nor does it preclude private schools from entering into separate busing agreements. (Cf. D'Amato Decl. ¶ 13; Robinson Decl. ¶ 6.) Additionally, the Section 4.5 requirements pertain only to the Bus Companies' employment practices in their school-age bus contracts with the DOE. Relevant to this point, the Bus Companies claim that "Section 4.5 amounts to a regulation over an entire industry" because "there are no legitimate alternatives for New York City school bus contractors" (Reply at 11), meaning that bus operators who currently contract for DOE school-age bus routes are arguably bound to those routes based on various logistical realities (see Decl. of Agostino Vona (Dkt. 53-1) ¶¶ 8-12). But a government contract is not necessarily "broad" simply because an actor who has acted in reliance on past versions of that contract no longer wants to bid on it. Cf. BIECA, 678 F.3d at 189 ("BIECA is free to renegotiate its CBA with Local 363 and its other signatory unions. BIECA is equally free to decline work on City PLA projects and continue to work under its existing CBAs on other private projects, or on City

24

projects not covered by the PLAs."). Finally, while the Bus Companies claim that the DOE "intends to apply Section 4.5 to every school busing contract in the future," as discussed above, there is nothing that prevents the DOE from instituting uniform procurement standards for the school-age bus routes. The Bus Companies' assertion on this point does not establish that either the DOE or the City plans to insert the EPPs into "all City contracts going forward." (Cf. Def. Response at 17 ("The current RFB has absolutely no impact on any of the multitudes of other vendor and service provider contracts DOE put out for bid or enters into multiple other areas of its broad educational mission throughout New York City.").) Based on the record before it, the court concludes that Section 4.5 is narrow with regard to the "range and type of covered conduct" such that the market-participant exception applies. See BIECA, 678 F.3d at 189 n.2.

iii.     Applicability of Similar Cases

The Bus Companies attempt to distinguish BIECA as "materially different" from the instant situation because that case, like Boston Harbor, concerned a project-labor agreement ("PLA"), not a more "permanent" contract. (See Reply at 11-12; see also Apr. 3, 2018, Hrg. Tr. 35:24-36:5 (stating that both Boston Harbor and BIECA found that the government was acting as a market participant because of the "amendment to the NLRA which, in the construction industry, allowed private employers to enter into [PLAs]").) Of course, nothing in the text of either BIECA or Boston Harbor explicitly limits those cases to matters involving PLAs in the construction industry. It is therefore not surprising that courts in this circuit have used both of these cases to analyze questions of the market-participant exception in a variety of contexts, including longer-term actions than project-labor agreements. See, e.g., N.Y. Bankers Ass'n v. City of New York, 119 F. Supp. 3d 158, 183 (S.D.N.Y. 2015) (using BIECA to analyze whether the market-participant exception applies to a banking statute); George v. Richter, No.

11-CV-8648 (PGG), 2014 WL 1666448, at *12-13 (S.D.N.Y. Apr. 25, 2014) (applying "the Boston Harbor exception" to the City's involvement in a collective-bargaining process). (See also Def. Suppl. Opp'n at 15-17.)

Cases in which various courts have found the market-participant exception to be inapplicable do not alter the court's conclusion. The main case on which the Bus Companies rely (see Mem. at 19), Van-Go Transport Co. v. New York City Board of Education, 53 F. Supp. 2d 278 (E.D.N.Y. 1999), concerned the refusal by the DOE's Office of Pupil Transportation ("OPT") to "conditionally approve employees 'to act as strike breakers,'" the first instance in which the DOE had rejected a contractor's request for such a "conditional certification[]." Id. at 281. Following this refusal, the DOE "enunciated by letter a policy limiting to 20 percent the percentage of an OPT contractor's workforce that could be conditionally certified." Id. The district court found that the DOE's "policy of refusing to conditionally certify replacements for striking workers" was not undertaken in its proprietary capacity because "the policy at issue extended beyond the parties to a single contract" and was "applied equally to all OPT contractors." Id. at 284, 288. The DOE's policy in Van-Go differs from Section 4.5 in two crucial respects: the limitation on conditional certification in that case was imposed to further clear public-policy goals, and any legitimate concerns put forth by the BOE were found to have been post hoc "pretext"; and the policy was applied to "every contract [the BOE] negotiated with its OPT contractors." See id. at 288-289, 293-94 (emphasis added). Neither such qualification applies to B3182, which, as discussed above, meets muster under both Cardinal Towing prongs. Similarly, when the district court in New York Bankers found that the Responsible Banking Act ("RBA") was not subject to the market-participant exception, it stated that the face of the law "unambiguously [sought] to advance general societal goals and encourage a general policy" of

regulating banks, 119 F. Supp. 3d at 184, and that the RBA sought to impose conditions on "transactions taking place among other private participants dealing in financial markets far afield from municipal deposit-taking," i.e. in a sphere wholly unrelated to the City's role as bank customer, id. at 186-87. No evidence before the court suggests that the DOE is making public policy under guise of market behavior, or that the DOE is not acting within a sphere in which it has a proprietary interest.

### c. Conclusion

Based on a thorough review of the scope and substance of Section 4.5, the court concludes that the DOE's actions in putting B3182 out to bid are consistent with its actions as a participant in the market for school-busing services. Because actions taken by government bodies acting within their capacity as market participants are not subject to preemption, the court does not reach the question of whether Section 4.5 is preempted by the NLRA under Garmon or Machinists.

### 2. ERISA Preemption

### a. Legal Overview

Unlike the NLRA, ERISA does contain an express preemption clause. ERISA § 514(a) provides that, subject to certain inapplicable exceptions, "the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered under ERISA. 29 U.S.C. § 1144(a) [ERISA § 514(a)]. "State law" includes "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State"; the term "State" includes "a state, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter." ERISA § 514(c).

## b. *Application*

Deciding whether Section 4.5 is preempted by ERISA requires answering a few questions. First, is Section 4.5 a state law? Second, even if it would normally be considered a state law, does it matter that the court has already found that the DOE put B3182 out for bid in its capacity as a proprietor, not a regulator? The court finds that Section 4.5 is not a state law for ERISA purposes and that the DOE's actions were undertaken in its capacity as a market participant, thus preventing the invalidation of Section 4.5 on preemption grounds.[8]

State action that falls within the ambit of ERISA must be a "rule[], regulation[], or other . . . action having the effect of law." ERISA § 514(a). Even before considering the question of the market-participant exception's applicability, the court is not convinced that B3182 is a state law. ERISA pointedly does not cover all state actions, but is restricted to action "having the effect of law." It thus cannot be the case that all state action undertaken "pursuant to local law" (Mem. at 21) is subject to preemption under ERISA. Cf. Assoc. Gen. Contractors of Am. v. Metro. Water Dist. (AGC), 159 F.3d 1178, 1183 n.2 (9th Cir. 1998) (rejecting an argument that "simply because a contract is legal and enforceable it has the effect of law of a state"). Rather, for an action to have the "effect of law," it must be generally applicable, not limited in scope to a "discrete project." Minn. Chapter of Assoc. Builders & Contractors, Inc. v. County of St. Louis, 825 F. Supp. 238, 243 (D. Minn. 1993); see AGC, 159 F.3d at 1183 ("The PLAs in question do reflect the action of [the government body], but they do not reflect anything remotely like rules, regulations or laws."). The court therefore finds that, even leaving the market-participation exception aside, B3182—which consists of a contract put out for bid by a government body that

---

[8] The court therefore does not reach what would be the third question in this analysis—whether the relevant provisions in Section 4.5 "relate to" an ERISA-covered employee benefit plan.

does not enforce any legal standards on non-parties to the contract—is not a state law for ERISA purposes.

The conclusion that B3182 is not state law is buttressed by the market-participant exception, which the court finds equally applicable to ERISA as it is to the NLRA. No court in the Second Circuit has ever considered whether the market-participant exception applies to ERISA; however, the Sixth and Ninth Circuits, as well as some district courts, have found that "[w]here a state or municipality acts as a proprietor rather than a regulator, it is not subject to ERISA preemption." Allied Constr. Indus. v. City of Cincinnati, 879 F.3d 215, 220 (6th Cir. 2018); see Johnson v. Rancho Santiago Cmty. College Dist., 623 F.3d 1011, 1023-24 (9th Cir. 2010); Lott Constructors, Inc. v. Camden Cty. Bd. of Chosen Freeholders, No. 93-CV-5636, 1994 WL 263851, at *19-20 (D.N.J. Jan. 31, 1994); Minn. Chapter, 825 F. Supp. at 243-44.[9]

Application of the market-participant exception in the ERISA context follows naturally from the law's purpose and text. In Boston Harbor, the Court found it appropriate to exempt state proprietary actions from NLRA preemption because "the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor." 507 U.S. 218 at 227. Like the NLRA, "ERISA does not provide any express or implied indication that a state may not act as a private party would be permitted to with respect to its property." Minn. Chapter, 825 F. Supp. at 243. Indeed, the text of ERISA explicitly distinguishes between regulatory and non-regulatory activity, much as Boston Harbor does. See id. ("ERISA's definition of state law preserves this distinction [between state law and other state action] by only including state action

---

[9] Other courts, including the New York Court of Appeals, have seemed to assume that the market-participant exception applies in the ERISA context despite the lack of a Supreme Court ruling on this question, while declining to find that various challenged actions fall within that safe harbor. See Assoc. Builders & Contractors Inc. N.J. Chapter v. City of Jersey City, 836 F.3d 412, 417 n.6 (3d Cir. 2016); Utility Contractors Ass'n of New Engl., Inc. v. City of Fall River, No. 10-CV-10994, 2011 WL 4710875, *8-9 (D. Mass. Oct. 4, 2011); Council of City of New York v. Bloomberg, 846 N.E.2d 433, 441-42 (N.Y. 2006). No court to consider the question has found that the market-participant exception does not apply in the ERISA context.

has the effect of law."). Thus, ERISA's preemption provision does not apply to "negotiated contract provisions demanded for certain projects" issued by a government entity "which acts much like any private party could," while acts taken "in a more general regulatory capacity" are subject to ERISA preemption. See AGC, 159 F.3d at 1182-83.

The court agrees that the market-participant exception applies in the ERISA context. Accordingly, the court holds that, because the DOE issued B3182 in its capacity as a proprietor, B3182 cannot be preempted by ERISA. Consequently, the court need not reach the question of whether B3182 "relates to" an ERISA-covered benefit plan to reach the conclusion that the DOE's actions are not preempted.

### C.    Balancing the Equities and the Public Interest

Although the court has already stated why the Bus Companies have neither alleged irreparable harm nor proven that they are likely to succeed on the merits at trial, the court will briefly consider the final two factors in the preliminary-injunction analysis: whether "the balance of equities tips in [Plaintiffs'] favor" and whether "an injunction is in the public interest." Winter, 555 U.S. at 20. To make this decision, the court "balance[s] the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences of employing the extraordinary remedy of injunction." Id. at 24 (internal quotation marks and citation omitted). "These factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

The court believes that these factors cut significantly in the DOE's favor. While the court respects the Bus Companies' argument in favor of an injunction, the Bus Companies cannot escape the fact that court has rejected their assertions of irreparable harm, making it difficult for them to claim that the balance of hardships tips in their favor. Conversely, the court agrees with

the DOE that the Bus Companies have downplayed the hardship to the DOE, as well as the

public interest, that would result from further delay to the bidding process for B3182. (See Def.

1st Opp'n at 23-24.) It seems beyond objection that the DOE's interest in the safe and reliable

transportation of schoolchildren is a weighty one, and that the court must seriously consider such

interests before taking steps that could interfere therewith.

## IV.    CONCLUSION

For the foregoing reasons, the Bus Companies' motion for a preliminary injunction

(Dkt. 1) is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
　　　　May 25, 2018

/s Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge